# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 13CR3560-WQH |
|---|---|
| Plaintiff, | ORDER |
| vs. | |
| SOFIA MARTINEZ (1), ANGEL ARCEO-SEVILLA(2), | |
| Defendant. | |

HAYES, Judge:

The matter before the Court is the motion (1) to suppress fruits of the search of the cell phones, (2) to suppress the wiretap, and (3) for leave to file further motions filed by Defendant Sofia Martinez. (ECF No. 43).

On October 30, 2013, the grand jury returned an indictment charging the Defendant Sofia Martinez and co-defendant Angel Arceo-Sevilla with conspiracy to bring in illegal aliens for financial gain in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and three counts of bringing in illegal aliens for financial gain in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2.

**MOTION TO SUPPRESS SEARCH OF THE CELL PHONES**

A. <u>Background facts</u>

In 2011, Homeland Security Investigation ("HSI") received information from a source that Defendant Sofia Martinez was coordinating the smuggling of illegal aliens from Mexico into the United States. The source of information said that Defendant Martinez would hire drivers to pick up illegal aliens on the north side and facilitate the

aliens into vehicles or vessels on the south side.

Department of Homeland Security Special Agent Aaron Mulkins initiated an investigation of the Defendant which included interviewing individuals apprehended attempting to enter the United States illegally. Over the next six to nine months, a number of individuals identified Defendant Martinez as involved in alien smuggling, including a material witness from a maritime smuggling event, the driver of a load vehicle, an individual involved in alien smuggling in east county, and an another individual who identified Defendant's photos as the person involved in the smuggling offense.[1]

Based upon this information, Agent Mulkins put a record in the TECS system so he could know when Defendant crossed the border. TECS is a system used at the international border to track people who come into and go out of the United States. At some point, Agent Mulkins changed the TECS look out to stop the Defendant and to notify him when she crossed the border into the United States.

On February 20, 2012 at about 2 a.m., agents arrested several illegal aliens on the beach in Carlsbad, California, along with two boat operators who were fleeing to Mexico in a boat. A cellular phone seized from one of the boat operators listed "Sofia" in the contact list. Phone records from the number listed to "Sofia" showed that the number had approximately 180 calls with phone numbers tied to known alien smugglers. Records showed that Defendant entered into the United States from Mexico at 1:31 a.m. on this same day in a Chevy Suburban with another individual who had previously been arrested for alien smuggling. Agents believed that Defendant entered into the United States to pick up the aliens and continued to investigate Defendant.

On March 28, 2012, Defendant made application for entry into the United States at the San Ysidro Port of Entry. Defendant was sent to secondary inspection based on a computer generated referral from the TECS system. Agent Mulkins was notified because he had put a look out in TECS. Agent Mulkins went to the San Ysidro Port of

---

[1] Agent Mulkins testified at an evidentiary hearing on May 13, 2014.

1  Entry and retrieved five cell phones and an Apple Touch out of Defendant's vehicle.
2  Agent Mulkins downloaded the phones at the Port of Entry using a Cellebrite system.
3  The Cellebrite system retrieves the phone numbers of phone calls to the phone and
4  phone calls made from the phone, as well as text messages, photos and videos. HSI
5  agents conducted the search of four of the five phones using the Cellebrite system
6  downloading the phone numbers and text messages into and out of the phones.[2] After
7  the search was completed, Defendant was released and her phones were returned.

8       Agents continued to investigate Defendant utilizing the information obtained
9  from Defendant's phones.

10 B. <u>Contentions of parties</u>

11      Defendant contends that the search of her phones at the border on March 28,
12 2012 was an illegal search and that all information derived from the search must be
13 suppressed. Defendant contends that reasonable suspicion did not exist to conduct the
14 extensive forensic search of the five cell phones. Defendant asserts that all of the
15 information that formed the basis for suspicion that she was involved in criminal
16 activity came from unreliable sources and that the Government has failed to prove
17 timely and reliable information to sustain a reasonable suspicion to search her phones.

18      The Government contends that the search of the Defendant's cell phones at the
19 Port of Entry on March 28, 2012 was a permissible border search and did not require
20 reasonable suspicion. The Government contends that the Cellebrite system gathers only
21 a small fraction of the information that can be gathered through a forensic analysis and
22 that the Cellebrite system at the Port of Entry is not an intrusive forensic exam which
23 requires a particularized suspicion. The Government further contends that the agents
24 had reasonable suspicion at the time of the border search that Defendant was involved
25 in smuggling illegal aliens into the United States and that Defendant used her phones
26 to facilitate her crime.

27 C. <u>Applicable law</u>

28

---

[2] The fifth phone contained no SIM card and was not operable.

1    "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness'...." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  "Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, ... reasonableness generally requires the obtaining of a judicial warrant." *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995).  "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, _ U.S._, 134 S.Ct. 2473, 2482 (2014) (holding that officers must generally secure a warrant before conducting a search of a cell phone under the warrant exception for search incident to arrest).

"What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search and seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985).  Under the border search exception to the Fourth Amendment warrant requirement, the Government may conduct "[r]outine searches of persons and effects of entrants are not subject to and requirement of reasonable suspicion, probable cause, or a warrant...." *Id.*  In *United States v. Flores-Montano*, 541 U.S. 149 (2004), the Supreme Court explained that "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border.  Time and again, we have stated that searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *Id.* at 152-53 (internal quotations and citation omitted).  The Supreme Court reversed the decision of the Court of Appeals for the Ninth Circuit to require reasonable suspicion in order to remove and search a gas tank from a vehicle.  The Supreme Court explained that "the reasons that might support a requirement of some level of suspicion in the case if highly intrusive searches of the person-dignity and privacy interests of the person being searched-simply do not carry over to vehicles.  Complex balancing tests to determine what is 'routine' search of a vehicle, as opposed to a more 'intrusive' search of a person, have no place in border

searches of vehicles." *Id.* at 152.

In *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013), *cert denied* 134 S.Ct. 899 (2014), the Court of Appeals for the Ninth Circuit addressed the reasonableness of a forensic examination of a laptop computer in the context of a border search. The Court of Appeals stated:

> Even at the border, individual privacy rights are not abandoned but "[b]alanced against the sovereign's interests." *United States v. Montoya de Hernandez*, 473 U.S. 531, 539, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). That balance "is qualitatively different ... than in the interior" and is "struck much more favorably to the Government." *Id.* at 538, 540, 105 S.Ct. 3304. Nonetheless, the touchstone of the Fourth Amendment analysis remains reasonableness. *Id.* at 538, 105 S.Ct. 3304. The reasonableness of a search or seizure depends on the totality of the circumstances, including the scope and duration of the deprivation. (citations omitted).

709 F.3d at 960. The Court of Appeals concluded that reasonable suspicion was required to justify the "exhaustive forensic search" of Cotterman's laptop computer under the border search exception to the warrant requirement. *Id.* at 966. The Court of Appeals concluded that "[i]t is the comprehensive and intrusive nature of a forensic examination - not the location of the examination - that is the key factor triggering the requirement for reasonable suspicion here." *Id.* at 962.

"The reasonable suspicion standard is not a particularly high threshold to reach. Although a mere hunch is insufficient..., the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerable short of satisfying a preponderance of the evidence standard." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013)(internal quotations omitted). Reasonable suspicion requires the agents making the stop be "aware of specific, articulable facts which, when considered with objective and reasonable inferences, form the basis for particularized suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). Reasonable suspicion is "a commonsense, nontechnical conception [] that deal[s] with the 'factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 191, 231). The Court must look to the

1  "totality of the circumstances" in each case to determine whether the standard is met.
2  *United States v. Cortez*, 449 U.S. 411, 417 (1981).

3  D.  <u>Ruling of the Court</u>

4  In this case, agents conducted a search of Defendant's cell phones at the Port of
5  Entry using the Cellebrite technology to collect phone numbers and text messages into
6  and out of the phones. Initially, the Government maintains that the border search
7  doctrine, in and of itself, justified this search without any resort to reasonable suspicion.
8  Defendant contends that the border search of her cell phones was only reasonable with
9  particularized suspicion. The Court does not reach the issue of whether the border
10 search doctrine, in and of itself, justified this search without any resort to reasonable
11 suspicion[3] because the facts of this case show clearly that the search was a direct result
12 of an ongoing investigation of the Defendant supported by reasonable suspicion to
13 investigate.

14 In this case, the facts show that the agents had information identifying Defendant
15 as a person working with an alien smuggling organization in 2011. Agents initiated and
16 conducted an investigation. Over the next six to nine months, Agent Mulkins obtained
17 information from a number of other sources supporting the reliability of the
18 information. The other sources were individuals engaged in alien smuggling or
19 individuals being smuggled. The Court considers these factors in assessing the
20 reliability of the informants. *See United States v. White*, 496 U.S. 325, 330 (1990) ("[I]f
21 a tip has a relatively low degree of reliability, more information will be required to
22 establish the requisite quantum of suspicion that would be required if the tip were more
23 reliable."); *Adams v. Williams*, 407 U.S. 143 (1972) (concluding that an unverified tip
24 may have been insufficient to support an arrest or search warrant but the information
25 carried the indicia of reliability to reasonable suspicion for forced stop and frisk).

---

[3]This would require the balancing of the traveler's diminished expectation of privacy at the border and the Government's interest in preventing the entry of unwanted persons and effects with the traveler's reasonable expectation of privacy in the personal information generally stored on a cell phone and the intrusiveness of the search. See *Cotterman*, 709 F.3d at 962-968.

However, the nature of the investigation into alien smuggling and the limitation of traditional investigative techniques at the border, would make these individuals the most likely sources of information. The Court concludes that the reliability of the initial information that Defendant was involved in alien smuggling was investigated and the agents had a reasonable belief that the information was reliable.

Agent Mulkins entered the Defendant into the TECS system in order to further his investigation. On February 20, 2012, agents arrested several undocumented aliens who had been smuggled into the United States by boat. Agents arrested the boat operators and one had a cell phone that listed "Sofia" in the contact list. Phone records from the number listed to "Sofia" showed that the number had approximately 180 calls with phone numbers tied to known alien smugglers. Defendant entered the United States at 1:31 a.m. that morning with another individual who had previously been arrested for alien smuggling, and the panga boat was discovered approximately 30 minutes later.

On March 28, 2012, Defendant made application for entry into the United States at the San Ysidro Port of Entry. Defendant was sent to secondary inspection based on a computer generated TECS referral. Five cellular phones were found in her vehicle, and HSI agents conducted a border search of four of the five phones using the Cellebrite system.[4] Under the totality of the circumstances, there was reasonable suspicion to search Defendant's cell phones when she presented herself at the border for admission into the United States. The agent had "specific, articulable facts which, when considered with objective and reasonable inferences, form[ed] the basis for *particularized* suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). The Court finds that the application of the reasonable suspicion requirement in this case was adequate to protect any reasonable expectation of privacy that the Defendant maintained in the information stored on her cell phones

---

[4] The fifth phone contained no SIM card and was not operable.

1  that was accessed by the Cellebrite search.[5]

2  Defendant's motion to suppress fruits of the search of the cell phones is denied.

### MOTION TO SUPPRESS THE WIRETAP

A. <u>Additional facts[6] contained in the affidavits in support of the wiretap application</u>

The contact list for one of the phones searched at the border on March 28, 2012 along with subpoenaed phone records from the phone number listed under "Sofia" in the February 20, 2012 arrests supported the suspicion of the agents that "Sofia" from the February 20, 2012 event was Defendant Martinez.

On June 14, 2012, Defendant posted her new phone number (later identified as M-2 in the wiretap application) on her publically accessible social networking page.

On June 17, 2012, a source of information told agents that a small yacht named "Elite" with a number of undocumented aliens would be traveling to Oceanside, CA later that day. The source of information told agents that the vessel would be pulled from the water by a vehicle driven by Defendant Martinez. At 10:33 a.m. on that day, Defendant entered the United States on foot through the Otay Mesa Port of Entry. At 6:00 p.m., agents found a boat named "Elite" in a marina in Shelter Island, San Diego. Two undocumented aliens, Juan Mesa-Valdez, and Ernesto Medina-Avalos were arrested. Mesa had two cell phones. One cell phone had a text message from a Mexican phone number known to be used by Martinez[7] stating "I haven't crossed yet...Where is the BBQ going to be? How much longer do I have to wait???". (ECF No. 43-2 at 14). M-2 was listed as a contact under "Sofi" on the phone taken by the agents from Mesa.

On June 18, 2012, from 12:50 a.m. to 10:45 a.m., M-2 made 25 calls to Medina's

---

[5] The Cellebrite process is limited technology and does not entail the comprehensive forensic evaluation conducted in *Cotterman*.

[6] These facts are detailed in the Affidavits in Support of the Wiretap Application. (ECF No. 43-2 and 43-3).

[7] Defendant was intercepted using a Mexican phone number on a wiretap in an unrelated investigation.

1  phone which was in the custody of the agents.

2  Additional investigation located an online ad for the "Elite" that listed a phone number for the seller. A phone which Defendant Martinez was intercepted using in an unrelated investigation had made at least three calls to the seller's number.

In October 2012, an undercover agent was introduced to Defendant for the purpose of working as a load driver. Defendant discussed pickup locations and remained in contact with the undercover agent using a phone later referred to as T-1 in the wiretap application. The relationship never developed further. Agents suspected compromise of the cover.

On October 5, 2012, agents on routine patrol saw a jet ski travel north near the United States-Mexico border and drop an individual on the beach in Imperial Beach, California. Agents arrested Noe Valdovinos-Torres in the area who stated that he had just been dropped off by the jet ski. On October 5, 2012, a phone (T-1 in the subsequent wiretap) made nine calls to a phone subscribed to Torres.

On November 14, 2012, agents saw a jet ski travel north from Mexico, drop off a passenger at a beach in Coronado and depart southward. The driver (Mesa, the same individual encountered on June 17, 2012) fell off the jet ski and was arrested. Investigation revealed that the jet ski was purchased on November 5, 2012 by Charleen Rodriguez and the balance was paid the next day by Defendant Martinez. The bill of sale listed Defendant's Mexican phone number.

On February 12, 2013, another jet ski was seized after dropping off four individuals at Imperial Beach, California. Agents compared a photograph of Defendant Martinez sitting on a jet ski which was posted on her social networking page to the jet ski seized on February 12, 2013 and determined that it is the same jet ski based on the registration number visible in the photograph.

On March 12, 2013, the Government requested and received an order allowing for a wiretap of T-1, which agents identified as used by Defendant Martinez. The affidavit in support of the wiretap application asserted that there was probable cause to

believe that Defendant Martinez was using T-1 in connection with the commission of criminal activity, including transportation of illegal aliens, and bringing in illegal aliens for financial gain in violation of federal laws.

The Government requested and received a second wiretap order for T-1 and two other phone lines on April 16, 2013. The affidavit in support of the wiretap application asserted that there was probable cause to believe that Defendant Martinez was using T-1 in connection with the commission of criminal activity, including transportation of illegal aliens, and bringing in illegal aliens for financial gain, and conspiracy to import controlled substances in violation of federal laws.

B. Contentions of Parties

Defendant contends that the government agents used fruits of the illegal cell phone search to support probable cause for the subsequent wiretap applications. Defendant contends that the wiretap applications were not supported by probable cause after cleansed of the illegal fruits. Defendant asserts that the March 12, 2013 affidavit in support of the wiretap application failed to set forth facts sufficient to establish a belief that she was engaging in ongoing crime or that communications about any crime would be intercepted as a result of the wiretap. In addition, Defendant contends that the March 12, 2014 and April 16, 2014 affidavits in support of the wiretap applications did not establish the requisite necessity.

The Government contends that the facts in the affidavit supporting the wiretap applications support the findings of probable cause and necessity.

C. Probable cause

Authorization for a wiretap is based on probable cause to believe that the telephone is being used to facilitate the commission of a crime, and the order need not name any particular person if such person is unknown. *See* 18 U.S.C. § 2518(1)(b)(iv). The district judge "must find probable cause to believe (1) that an individual is committing, has committed, or is about to commit specified offenses, ...; (2) that communications relevant to that offense will be intercepted through the wiretap, ...; and

(3) that the individual who is the focus of the wiretap investigation will use the tapped phone." *United States v. Meling*, 47 F.3d 1546, 1552 (9th Cir. 1995); *see* 18 U.S.C. § 2518(3). "Probable cause means only a 'fair probability,' not certainty, and requires consideration of the totality of the circumstances." *United States v. Garcia-Villalba,* 585 F.3d 1223, 1233 (9th Cir. 2009)(citation omitted). The decision is made by the issuing court on the basis of practical, common-sense considerations and overturned only if lacking a "substantial basis." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

In this case, each of the affidavits in support of the wiretap applications set forth facts sufficient to establish probable cause that the target telephone was used by Defendant Sofia Martinez to violate federal laws, specifically to illegally smuggle Mexican nations or individuals from other countries into the United States and that communications about her criminal activity would be intercepted as a result of the wiretap. The phone analysis and other information from the investigation directly linked the Defendant to specific alien smuggling events. The Government seized a phone from an illegal alien which contained a text message from Defendant's known Mexican phone number sent on the date the illegal alien was arrested attempting to illegally enter the United States. The affidavit describes a photograph of the Defendant posted on her Facebook account on a jet ski that was seized in a smuggling event. Agents linked the Defendant directly to a jet ski used to drop off an individual at the beach in Coronado and depart southbound toward Mexico. Phone analysis linked the T-1 phone line used by Defendant Martinez to phones used by a number of illegal aliens and a number of known smugglers.

D. <u>Necessity</u>

Wiretap authorizations are governed by the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-2522. "To obtain a wiretap, the government must overcome the statutory presumption against this intrusive investigative method by proving necessity." *United States v. Rivera*, 527 F.3d 891, 897 (9th Cir. 2008)(citations omitted). The purpose of this requirement is to "assure that wiretapping is not resorted

to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). A judge must "determine that the ordinary investigative technique employing a normal amount of resources have failed to make the case within a reasonable period of time." *United States v. Spagnuolo*, 549 F.2d 705, 711 (9th Cir. 1977). However, "the government need not exhaust every conceivable investigative technique in order to show necessity." *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000)(citation omitted).

Section 2518(1)(c) provides that the affiant in support of an application for a wiretap must provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). "*Each wiretap application, standing alone, must satisfy the necessity requirement.*" *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988). The "full and complete statement" requirement of Section 2518(1)(c) is satisfied where the affidavit provides "specific probative facts" which "show with specificity why *in this particular investigation* ordinary means of investigation will fail." *United States v. Commito*, 918 F.2d 95, 97-98 (9th Cir. 1990)(quotation omitted).

In this case, the each affidavit in support of the wiretap applications was sufficient to show necessity. Because a wiretap application requires a showing of probable cause, traditional methods of investigation will often be described in detail in the affidavit in support. In this case, the affiant described the evidence collected through traditional investigative methods from 2011 until March 12, 2013. Agents had made progress in the investigation of the suspected organization using informants and other investigative techniques but the investigation had not acquired sufficient evidence to prosecute and convict the members of the smuggling organization, including the Defendant. The affiant explained to the district judge that the wiretap was necessary in order to identify facilities used by the organization, identify other unknown co-conspirators, locate seized proceeds, and locate records or other documents used in

furtherance of the maritime smuggling. Confidential informants had been used and became unreliable. Efforts to use an undercover agent had been unsuccessful. Physical surveillance was not effective because Defendant did not reside in the United States and displayed a heightened ability for counter-surveillance. The border search had been utilized and produced only phone records. The investigative techniques suggested by Defendant to further the investigation without utilizing wire interception do not lead to the conclusion that the affidavit was not sufficient to establish necessity. In this case, law enforcement actively investigated Defendant for a number of years utilizing traditional methods of investigation and reasonably concluded that they had yet to make the case. *See Commito*, 918 F.2d at 98-99 ("An investigative agency is not required to exhaust all possible investigative techniques before resorting to a wiretap."). The affidavits set forth specific facts and circumstances to support the district judge's conclusion that normal investigative techniques were inadequate to accomplish the goals of the investigation.

## CONCLUSION

IT IS HEREBY ORDERED that the motion (1) to suppress fruits of the search of the cell phones is denied; (2) to suppress the wiretap is denied; and (3) for leave to file further motions filed by Defendant Sofia Martinez is granted. (ECF No. 43).

DATED: July 22, 2014

**WILLIAM Q. HAYES**
United States District Judge